# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

OLMSTED MEDICAL CENTER,

        Plaintiff,


v.
                **MEMORANDUM OF LAW & ORDER**
                Civil File No. 21-1309 (MJD/BRT)


CONTINENTAL CASUALTY CO.,

        Defendant.

---

Christopher H. Yetka and Sarah DeWitt Greening, Larkin Hoffman Daly & Lindgren, Ltd., Counsel for Plaintiff.

Julia J. Nierengarten, Louise A. Behrendt, and Robert William Vaccaro, Meagher & Geer, PLLP, Counsel for Defendant.

---

## I.      INTRODUCTION

This matter is before the Court on Defendant Continental Casualty

Company's Motion to Dismiss.  [Docket No. 17]  The Court heard oral argument

on December 8, 2021.

## II.     BACKGROUND

### A.     Factual Background

1

## 1.    The Parties

Plaintiff Olmsted Medical Center ("Olmsted") is a nonprofit medical organization with its principal place of business in Olmsted County, Minnesota, that provides preventive, primary, and specialty care in southeastern Minnesota. (Am. Compl. ¶¶ 2, 34.)  Approximately 60% of the surgeries and procedures performed at Olmsted's locations are non-essential or elective surgeries.  (Id. ¶ 34.)

Defendant Continental Casualty Company ("Continental") is an Illinois corporation licensed to sell insurance policies in Minnesota.  (Am. Compl. ¶ 3.)

## 2.    The Policy

Continental issued insurance policy, No. XXXXXX5797 to Olmsted for the policy period January 1, 2020, to January 1, 2021 (the "Policy").  (Am. Compl. ¶ 8; Am. Compl., Ex. A, Policy.)  The Policy provides coverage for up to $171,297,565 in "Business Interruption," $500,000 in "Contingent Business Interruption," and $1,000,000 in "Denial of Access by Civil Authority / Ingress – Egress."  (Policy at 14-16.)

The Business Interruption Provision states:

This policy covers against loss resulting from necessary interruption of business caused by direct physical loss of or damage to covered

2

property, except ***Finished Stock***, by the peril(s) insured against and occurring during the term of this policy at covered ***Locations*** occupied by the Insured, subject to the sublimit specified in Section **I.4** of this policy.

In the event of such physical loss or damage the Company shall be liable for the actual loss sustained by the Insured resulting directly from such interruption of business . . . for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy, but in no event to exceed the number of months specified in Section **I.5 TIME LIMITS** if a Business Interruption Period of Indemnity limit is specified.

(Policy at 21.)

The Contingent Business Interruptions Revision Endorsement states that

Continental will cover:

[L]oss to the Insured resulting from necessary interruption of business conducted by the Insured at ***Locations*** occupied by the Insured and covered in this policy, caused by perils insured against that result in direct physical loss or damage to any real or personal property, of the type insured hereunder, owned and operated by:

(a) direct suppliers or service providers of the Insured, which wholly or partially prevents the delivery of materials, products or services . . . to the Insured or to others for the account of the Insured; or

(b) direct customers of the insured, to whom the Insured's products or services . . . are provided, which wholly or

3

> partially prevents the acceptance of said products or services
> by the Insured's customers; or
>
> (c) any other third-parties that the Insured depends upon to
> attract customers.  Coverage under this subsection is limited
> to dependent property within 5 miles of the Insured's
> **_Location_** . . . .

(Policy at 52.)

The Denial of Access by Civil Authority and Ingress – Egress provision

states that Continental will cover:

> for up to the time limit specified in Section **I.5.** but not exceeding the
> sublimit shown in Section **I.4.** of this policy, the actual loss
> sustained:
>
> (a) during the period of time while access to the Insured's **_Location_**
> is prohibited by order of civil authority, but only when such order is
> given as a direct result of physical loss or damage to property of the
> type insured from a peril insured against occurring at or in the
> immediate vicinity of said **_Location_**; or
>
> (b) during the period of time when as a direct result of physical loss
> or damage to property of the type insured from a peril insured
> against, ingress to or egress from the Insured's **_Location_** is thereby
> physically prevented.

(Policy at 24.)  The time limit for Civil Authority and Ingress-Egress coverage is

30 days.  (Id. at 17.)

The Policy contains a provision titled "Suit Against the Insurers," which

states:

4

No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all of the requirements of this policy, nor unless commenced within the twelve (12) months immediately following inception of the loss, unless a longer period of time is prescribed by the insurance laws of the state or jurisdiction in which this contract is issued.

(Policy at 41.)

### 3.   The Pandemic

In response to the COVID-19 pandemic, on March 19, 2020, Minnesota Governor Tim Walz issued Executive Order 20-09, which, as of March 23, 2020, required indefinite postponement of all non-essential or elective surgeries and procedures that utilized PPE or ventilators.  (Am. Compl ¶ 29; Nierengarten Decl., Ex. 1, Executive Order 20-09 ¶ 1.)

The Executive Order provided the following basis for postponement of non-essential or elective surgeries and procedures that utilized PPE or ventilators:

COVID-19 cases in Minnesota are rapidly increasing and risk overwhelming the healthcare system.  On March 17, 2020, the Centers for Disease Control and Prevention recommended delaying elective inpatient and outpatient surgeries and procedures, which include dental procedures.  On March 18, 2020, the Centers for Medicare and Medicaid Services ("CMS") issued similar guidance. CMS recognizes that conservation of critical resources such as ventilators and personal protective equipment ("PPE") is essential to

aggressively address the COVID-19 pandemic.  CMS has also
recognized that non-emergent or elective procedures increase
patient and provider contact, which could increase the risk of
COVID-19 transmission.  This risk provides further reason to delay
elective surgeries and procedures. To ensure the health and safety of
Minnesotans, it is important to establish consistency throughout our
healthcare system and ensure that our resources can be focused on
responding to this pandemic.

Executive Order 20-09 was in effect until a new executive order was issued

on May 5, 2020, that lifted the moratorium on elective procedures effective May

10, 2020.  (Nierengarten Decl., Ex. 2, Executive Order 20-51.)

Olmsted alleges that from the spring of 2020 to approximately June 2021,

patients were not allowed to be treated at Olmsted for non-essential or elective

surgeries "due to the pervasive existence of SARS-CoV-2 at Olmsted Medical, at

its suppliers, service providers, customers and third-parties, and in the

immediate vicinity of Olmsted Medical, due to the Governor's Order, and

quarantine and isolation protocols."  (Am. Compl. ¶ 35.)  Thus, Olmsted alleges

it canceled or postponed approximately 50% of its surgeries and procedures in

that timeframe due to "the existence of COVID-19 and the attendant SARS-CoV-

2 virus, Executive Order 20-09, and the required quarantine and isolation

protocols."  (Id. ¶ 45.)  Olmsted further asserts that its suppliers and service

providers within five miles of the insured property "were also directly impacted by COVID-19 during this time." (Id. ¶¶ 46-47.)

On May 25, 2020, Olmsted confirmed its first COVID-19 case within its facility. (Am. Compl., Ex. D at 152.) From the spring of 2020 through June 2021, at least 4,800 community members and 129 Olmsted employees tested positive for COVID-19 and at least 954 Olmsted employees were quarantined due to exposure to COVID-19 or because they experienced COVID-19 related symptoms. (Am. Compl. ¶¶ 36-37; Am. Compl., Ex. C at 71.) Olmsted asserts that, because of the prevalence of positive COVID-19 tests, it would not have been able to continuously clean and disinfect its facility to safely allow elective and non-essential procedures to occur. (Am. Compl. ¶ 35.) It claims to have suffered at least $19,336,351.00 in losses. (Id. ¶ 48.)

### 4.    Olmsted's Claim

Olmsted "discovered and reported the loss during the Policy period and submitted" a Property Loss Notice to Continental on May 12, 2020. (Am. Compl. ¶ 49.) Specifically, Olmsted submitted a claim for loss of income incurred due to the COVID-19 pandemic. (Id. ¶ 50; Am. Compl., Ex. G ("The insured has been and will be affected by the COVID19 event (loss of income, extra expense, etc.)".)

Olmsted advised Continental that it had an interruption of business caused by
client cancellations of appointments due to the fear of COVID-19 and the
Executive Order issued by Governor Walz.  (Am. Compl., Ex. B, May 14, 2020
Denial.)  On May 14, 2020, Continental denied coverage for business interruption
and civil authority claims because the Policy "does not respond to provide
coverage for your claim."  (Am. Compl. ¶ 52; Am. Compl., Ex. B, May 14, 2020
Denial.)

### B.   Procedural History

On May 12, 2021, Olmsted served a Minnesota state court Summons and
Complaint on Continental.  ([Docket No. 1] Notice of Removal ¶ 1.)  On June 1,
2021, Continental removed the matter to this Court based on diversity
jurisdiction.

On July 19, 2021, Olmsted filed an Amended Complaint against
Continental alleging: Count 1: Breach of Contract; and Count 2: Declaratory
Judgment.  [Docket No. 15]  Olmsted seeks reimbursement for an estimated loss
of $19,336,351; a declaration that the Policy provides coverage for Olmsted's
losses and that Continental must reimburse Olmsted for all losses up to the
Policy limits; a declaration that Continental breached its contractual obligations

8

to pay Olmsted in full for all losses; and a declaration that Continental is

obligated to pay all proper relief.

Continental has now moved for dismissal of the Amended Complaint on

the bases that Olmsted failed to bring this action within the limitations period

and that the losses do not fall within the Policy's coverage.  Continental also

asserts that several exclusions bar coverage but does not address the exclusions

in this motion to dismiss.

## III.    DISCUSSION

### A.    Motion to Dismiss Standard

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a party may

move the Court to dismiss a claim if, on the pleadings, a party has failed to state

a claim upon which relief may be granted.  In reviewing a motion to dismiss, the

Court takes all facts alleged in the complaint to be true.  Zutz v. Nelson, 601 F.3d

842, 848 (8th Cir. 2010).

> To survive a motion to dismiss, a complaint must contain sufficient
> factual matter, accepted as true, to state a claim to relief that is
> plausible on its face.  Thus, although a complaint need not include
> detailed factual allegations, a plaintiff's obligation to provide the
> grounds of his entitlement to relief requires more than labels and
> conclusions, and a formulaic recitation of the elements of a cause of
> action will not do.

Id. (citations omitted).

9

In deciding a motion to dismiss, the Court considers the complaint and "materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings.  For example, courts may consider matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint."  Greenman v. Jessen, 787 F.3d 882, 887 (8th Cir. 2015) (citations omitted).

"The extent of an insurer's liability is governed by the language of the insurance policy."  Eng'g & Const. Innovations, Inc. v. L.H. Bolduc Co., 825 N.W.2d 695, 704 (Minn. 2013) (citation omitted).  "Interpretation of an insurance policy, and whether a policy provides coverage in a particular situation, are questions of law. . . ."  Id.

> If the language of an insurance contract is unambiguous, it must be given its plain and ordinary meaning.  But if the language is ambiguous, it will be construed against the insurer, as drafter of the contract.  Coverage provisions are construed according to the expectations of the insured.

Travelers Indem. Co. v. Bloomington Steel & Supply Co., 718 N.W.2d 888, 894 (Minn. 2006) (citations omitted).  The court may not adopt a "construction of an insurance policy which entirely neutralizes one provision if the contract is susceptible of another construction which gives effect to all its provisions and is

consistent with the general intent." L.H. Bolduc, 825 N.W.2d at 705 (cleaned up and citation omitted).

"The initial burden of demonstrating coverage rests with the insured; the burden of establishing the applicability of exclusions rests with the insurer." Domtar, Inc. v. Niagara Fire Ins. Co., 563 N.W.2d 724, 736 (Minn. 1997).

**B.      Limitations Period**

The Policy requires Olmsted to bring any action under the Policy within 12 months following the "inception of the loss."  Olmsted alleges that its losses began with the issuance of the Minnesota Executive Order that postponed non-essential or elective surgeries effective March 23, 2020.  However, Olmsted did not file this lawsuit until May 12, 2021, more than 13 months later.  The Court holds that to the extent that Olmsted's claim is based on loss caused by the Governor's Executive Order, the lawsuit is time barred.

**1.      Whether the Policy Shortens the Applicable Limitations Period**

Minnesota permits parties to contractually shorten a statutory limitations period, "absent a specific statute to the contrary," "provided the limitation is not unreasonably short."  Henning Nelson Constr. Co. v. Fireman's Fund Am. Life Ins. Co., 383 N.W.2d 645, 650 (Minn. 1986) (citations omitted).  "Such provisions,

however, are not generally favored and are strictly construed against the party

invoking them." Id. at 651.

> The proper analysis for a court in examining whether the parties to a
> contract can validly shorten the statutorily prescribed limitation
> period is twofold.  The court must first look to see if a specific
> statute prohibits the use of a different limitation period in the
> particular case.  If no such statute exists, the parties are then free to
> shorten the limitations period as long as the contractual period is not
> unreasonable in length.  Whether a contractual limitation is
> reasonable or not is to be decided on a case-by-case basis, looking at
> the particular facts of each case.

Id. (citations omitted).

> Here, the Policy states:

> No suit or action on this policy for the recovery of any claim shall be
> sustainable in any court of law or equity unless the Insured shall
> have fully complied with all of the requirements of this policy, nor
> unless commenced within the twelve (12) months immediately
> following inception of the loss, unless a longer period of time is
> prescribed by the insurance laws of the state or jurisdiction in which
> this contract is issued.

(Policy at 41.)

No specific statute prohibits the use of a different limitation period in this

particular case.  Olmsted notes that Minnesota law provides a general 6-year

statute of limitations for claims based on contracts, including insurance policies,

see Minn. Stat. § 541.05, subd. 1, and a 2-year limitations period for fire insurance policies, see Minn. Stat. § 65A.01, subd. 3.

Olmsted's citation to Minnesota Statute § 65A.01's two-year statute of limitations is unavailing because Olmsted's claims involve no fire loss.  See Minn. Stat. § 65A.01, subd. 3; Noonan v. Am. Fam. Mut. Ins. Co., 924 F.3d 1026, 1030 (8th Cir. 2019).  And Minnesota Statute § 541.05 provides a general six-year limitation period for contracts but applies only "upon a contract or other obligation, express or implied, as to which no other limitation is expressly prescribed." Minn. Stat. § 541.05, subd. 1(1).  "[A]bsent a specific statute to the contrary, parties to an insurance policy can reasonably modify the limitations period;" and section 541.05, subd. 1(1)'s six-year statute of limitations does not prevent parties from contracting for a shorter limitations period.  Henning, 383 N.W.2d at 650 n.5.  In this case, the contract expressly prescribes a 12-month limitation period measured from inception of loss, and no Minnesota statute requires a different period.

### 2. Whether the One-Year Time Limitation Is Reasonable

#### a) Standard for Reasonableness of Limitations Period

The decision whether the limitations period in an insurance policy is unreasonable is made "on a case-by-case basis, looking at the particular facts of each case." Henning Nelson Constr. Co., 383 N.W.2d at 651.

> Among the factors to be used in determining reasonableness is the amount of time remaining under the limitations clause after the insurer denies a claim. The Court also considers whether additional information was needed for the insured's cause of action to mature, and whether the parties held equal bargaining power in negotiating the contract.

Michael Foods, Inc. v. Allianz Ins. Co., No. 02-CV-3504 (JMR/FLN), 2003 WL 1956294, at *2 (D. Minn. Apr. 21, 2003) (citations omitted).

### b) Application to the Facts Alleged by Olmsted

Under the facts as alleged by Olmsted, a one-year limitations period is reasonable. Olmsted was immediately aware of its loss when the Governor issued the Executive Order barring non-essential procedures and was immediately aware of the cause of its loss – the Executive Order and the COVID-19 pandemic. Olmsted promptly made a claim on the Policy to Continental on May 12, 2020, less than two months after the Executive Order went into effect. Continental immediately denied the claim two days later, on May 14, 2020, leaving Olmsted ten months to file suit after knowing of its loss, knowing the cause of its loss, and knowing that Continental denied coverage for its loss.

14

Moreover, Olmsted is a sophisticated business entity with strong bargaining power, not an individual homeowner or small business owner who agreed to a form insurance contract with no bargaining power.  See Michael Foods, Inc., 2003 WL 1956294, at *3 (finding one-year limitation period reasonable when "plaintiff is a highly sophisticated company that worked with an insurance broker" and when insurer denied coverage when there was six months left for plaintiff to initiate litigation).  This is unlike cases cited by Olmsted in which insurers refused to deny coverage within the limitations period and the cause of the loss could not be determined within the contractual limitations period.  Nor was this a latent loss, where the severity of the damage could not be discovered for years. The loss was ongoing, but Olmsted was immediately aware of the severity, if not the duration, of the damage when the Executive Order barred all non-essential procedures.

### 3.    Losses Occurring Within the One-Year Period

The Court holds that, to the extent that Olmsted's claim is based on loss caused by the Governor's Executive Order, the lawsuit is time barred.  The Executive Order barring non-essential surgeries was issued on March 19, 2020, went into effect on March 23, 2020, and was vacated on May 5, 2020, effective

May 10.  Thus, the loss began and concluded before May 12, 2020, the one-year

date before this lawsuit was commenced.

The Court holds that, to the extent Olmsted's claim is based on the theory

that its loss was caused by the presence of COVID-19, contamination, and

quarantining, the question of whether the suit was brought within one year of

the inception of the loss is a question that cannot be decided on a motion to

dismiss because the record is not developed regarding when Olmsted did know

or should have known that it suffered an appreciable loss.

### C.     Business Interruption Coverage

Business interruption coverage does not apply because Olmsted does not

allege "direct physical loss of or damage to" its property.  "'[D]irect physical loss

of' property . . . refers to direct physical loss of property, not the inability to use

property."  Santo's Italian Cafe LLC v. Acuity Ins. Co., 15 F.4th 398, 405 (6th Cir.

2021).

### 1.     Whether a "Direct Physical Loss of Property" Is Required

The Policy covers loss resulting from business interruption caused by

"physical loss of or damage to covered property."  (Policy at 21.)  The Eighth

Circuit has held that, under Minnesota law, a policy covering "direct physical

16

loss of or damage to property" did not cover a "mere loss of use or function."

Pentair, Inc. v. Am. Guarantee & Liab. Ins. Co., 400 F.3d 613, 614, 616 (8th Cir.

2005).  As the Pentair court noted, every Minnesota state court decision that

found direct physical loss involving functional impairment of the insured

property also involved insured property that was physically contaminated.  This

year, the Eighth Circuit addressed a COVID-19 claim similar to the claim

asserted in this case with similar policy language ("accidental physical loss or

accidental physical damage") and explicitly rejected the disjunctive argument.

Oral Surgeons, P.C. v. Cincinnati Ins. Co., 2 F.4th 1141, 1143-44 (8th Cir. 2021).

Although Oral Surgeons was decided under Iowa law, the Eighth Circuit held

that Iowa and Minnesota law were not "materially distinguishable."  Id. at 1145.

And for a loss to be covered, reaffirming Pentair, "there must be some

physicality to the loss or damage of property—e.g., a physical alteration, physical

contamination, or physical destruction."  Id. at 1144.  The adjective "physical"

modifies both "loss of" and "damage to," demonstrating that there must be a

physical loss or damage for a loss to be covered.  "Moreover, 'direct physical loss

of' and 'direct physical damage to' can support different meanings— 'loss of'

referring to complete destruction of the insured premises, while 'damage to'

refers to any other injury requiring repair." <u>Robert E. Levy, D.M.D., LLC v.</u>

<u>Hartford Fin. Servs. Grp. Inc.</u>, 520 F. Supp. 3d 1158, 1173 (E.D. Mo. 2021)

(gathering cases).

> The Policy states that business interruption losses will be covered:

> for only such length of time as would be required with the exercise
> of due diligence and dispatch to rebuild, repair or replace such part
> of the property herein described as has been damaged or destroyed,
> commencing with the date of such damage or destruction and not
> limited by the date of expiration of this policy, but in no event to
> exceed the number of months specified in Section **I.5 TIME LIMITS**
> if a Business Interruption Period of Indemnity limit is specified.

(Policy at 21.)  Section 1.5 TIME LIMITS provides a limit of 24 months.  (<u>Id.</u> at 17.)

The time limit on business loss coverage – the remediation period – further

supports the conclusion that a physical loss is required.  As the Eighth Circuit

noted in <u>Oral Surgeons, P.C.</u>, "[t]hat the policy provides coverage until property

'should be repaired, rebuilt or replaced' or until business resumes elsewhere

assumes physical alteration of the property, not mere loss of use."  2 F.4th at

1144.  The existence of an outer limit on this remediation period capping the

period of coverage at 24 months ("the number of months specified in **Section**

**I.5**") does not alter the analysis.  The "catchall" is simply an outer limit on the

time period that applies because the time to "rebuild, repair or replace" the

damaged property could conceivably take more than 2 years, and Continental has capped the time period during which it will pay business interruption losses in order to limit its liability.

### 2.       Whether Olmsted Suffered a Physical Loss

Olmsted has failed to allege that it suffered a physical loss or damage.  As this Court has held, "the loss of use of property because of government closure orders because of COVID-19 does not constitute a direct physical loss of property to trigger coverage."  Bachman's Inc. v. Florists' Mut. Ins. Co., 525 F. Supp. 3d 984, 989 (D. Minn. 2021).  "Under Minnesota law, 'direct physical loss' of property requires a showing that the insured property is injured in some way."  Id. at 987.  And even if a plaintiff alleges that the COVID-19 virus was present on the premises, "there can be no dispute that the virus can be easily eliminated with routine cleaning procedures."  Id. at 988–89.

> [E]ven when present, COVID-19 does not threaten the inanimate structures covered by property insurance policies, and its presence on surfaces can be eliminated with disinfectant.  Thus, even actual presence of the virus would not be sufficient to trigger coverage for physical damage or physical loss to the property.  Because routine cleaning, perhaps performed with greater frequency and care, eliminates the virus on surfaces, there would be nothing for an insurer to cover, and a covered "loss" is required to invoke the additional coverage for loss of business income under the Policy.

19

<u>Uncork & Create LLC v. Cincinnati Ins. Co.</u>, 498 F. Supp. 3d 878, 883–84, (S.D. W.

Va. Nov. 2, 2020), <u>quoted with approval in</u> <u>Bachman's Inc.</u>, 525 F. Supp. 3d at

989.

> As numerous courts have recognized, COVID-19 hurts
> people, not property, as the pandemic impacts human health and
> human behavior, not physical structures.  Thus, all that is needed to
> decontaminate is to wipe the virus off the surface with disinfectant,
> attesting to the fact that there is no underlying damage.  The Court
> concludes that COVID-19 does not cause direct physical damage to
> property as the term is used in the insurance policies.

<u>Nguyen v. Travelers Cas. Ins. Co. of Am.</u>, No. 2:20-CV-00597-BJR, 2021 WL

2184878, at *10 (W.D. Wash. May 28, 2021) (cleaned up and citations omitted)

(gathering cases).  Therefore, Olmsted's claim of physical loss or damage based

on persons testing positive for COVID-19 or the presence of the virus in its

buildings fails.  <u>See, e.g.</u>, <u>Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins.</u>

<u>Co.</u>, No. 21-11046, 2021 WL 3870697, at *2 (11th Cir. Aug. 31, 2021) ("[The insured

dental office] finds it problematic that its office is an enclosed space where viral

particles tend to linger, and where patients and staff must interact with each

other in close quarters.  Even so, we do not see how the presence of those

particles would cause physical damage or loss to the property.") (applying

Georgia law).  See also, e.g., Zwillo V, Corp. v. Lexington Ins. Co., 504 F. Supp.

3d 1034, 1040-41 (W.D. Mo. 2020).

The Court further notes that, even if a physical loss were not required,

Olmsted fails to allege a "severing of an owner's possession of property" because

its property was never closed, and Olmsted admittedly continued to physically

occupy its facilities and to provide essential medical care.  Cf. Seifert v. IMT Ins.

Co., No. CV 20-1102 (JRT/DTS), 2021 WL 2228158, at *3–4 (D. Minn. June 2, 2021)

(addressing hair salon owner whose business was entirely closed by the

Governor's Order).  The Executive Order merely regulated what type of

procedures Olmsted was permitted to perform; it did not prevent Olmsted from

entering and occupying its property, and it did not prevent Olmsted from

performing "essential" medical procedures at its property.  See Santo's Italian

Cafe LLC v. Acuity Ins. Co., 15 F.4th 398, 404–05 (6th Cir. 2021) ("Some courts, it

is true, have held that a loss of the ability to use property sometimes may

constitute a 'physical loss.'  But each case involved property that became

practically useless for anything.") (citing, e.g., Seifert, 2021 WL 2228158, at *5).

Like medical facilities plaintiffs in other similar cases, Olmsted "has not plausibly

alleged that the presence of COVID-19 made its properties unusable.

21

[Olmsted]'s hospitals continued to operate with 'extra precautions;' their

functions were not destroyed, nor were they declared unsafe to enter."

Northwell Health, Inc. v. Lexington Ins. Co., No. 21-CV-1104 (JSR), 2021 WL

3139991, at *6 (S.D.N.Y. July 26, 2021).

###### D.      Contingent Business Interruption Coverage

Olmsted fails to plead facts to support application of contingent business

interruption coverage, because there is no allegation that any direct suppliers,

customers, or other third parties that Olmsted depended upon to attract

customers suffered a "direct physical loss or damage to any real or personal

property."

Olmsted asserts that Continental owes it coverage under the Contingent

Business Interruptions Revision Endorsement of the Policy, which provides:

> [L]oss to the Insured resulting from necessary interruption of
> business conducted by the Insured at _**Locations**_ occupied by the
> Insured and covered in this policy, caused by perils insured against
> that result in direct physical loss or damage to any real or personal
> property, of the type insured hereunder, owned and operated by:
>
> (a) direct suppliers or service providers of the Insured, which wholly
> or partially prevents the delivery of materials, products or services . .
> . to the Insured or to others for the account of the Insured; or
>
> (b) direct customers of the insured, to whom the Insured's products
> or services . . . are provided, which wholly or partially prevents the

acceptance of said products or services by the Insured's customers; or

(c) any other third-parties that the Insured depends upon to attract customers.  Coverage under this subsection is limited to dependent property within 5 miles of the Insured's **_Location_** . . . .

(Policy at 52.)

Contingent Business Interruption coverage does not apply because there are no allegations that Olmsted's losses were caused by the direct physical loss or damage to the property of its direct suppliers or providers, or to the property of its direct customers, or to others on which Olmsted depended to attract customers.  The Amended Complaint fails to describe or identify any direct supplier or service provider that incurred direct physical loss or damage to property that prevent the delivery of supplies to Olmsted.  Nor does it describe or identify any customers who incurred direct physical loss or damage to property that prevented the customer from receiving Olmsted's services.  And it does not describe or identify physical loss or damage to property operated by others that Olmsted depends on to attract customers.

Olmsted generally notes that some persons in the community tested positive for COVID-19 and alleges that these positive cases, along with the Governor's Order and quarantine and isolation protocols, led to canceled

procedures, but it does not identify a physical loss or identify any particular

suppliers or customers who were affected by the pandemic. Olmsted speculates

that if a customer or supplier caught COVID-19 then it likely spread to their

property and then created a loss, but this theory is purely speculative and lacks

any foundation in the Amended Complaint.

### E. Civil Authority Coverage

Olmsted's claim for civil authority coverage is time-barred and,

additionally, Olmsted fails to plead facts to support a such a claim.

The Policy provides Civil Authority coverage for:

> the actual loss sustained: (a) during the period of time while access
> to the Insured's **_Location_** is prohibited by order of civil authority,
> but only when such order is given as a direct result of physical loss
> or damage to property of the type insured from a peril insured
> against occurring at or in the immediate vicinity of said **_Location_**.

(Policy at 24.)

Here, there is no allegation that there was a physical loss or damage to

property at or in the immediate vicinity of Olmsted's property. See, e.g., Sandy

Point Dental, PC v. Cincinnati Ins. Co., 488 F. Supp. 3d 690, 694 (N.D. Ill. 2020)

("Just as the coronavirus did not cause direct physical loss to plaintiff's property,

the complaint has not (and likely could not) allege that the coronavirus caused

direct physical loss to other property"), <u>cited with approval in</u> <u>Bachman's Inc.,</u>

525 F. Supp. 3d at 989.

Additionally, the Governor's Executive Order never "prohibited" access to

Olmsted's premises.  Olmsted's employees and patients always had access for

essential medical procedures and the premises remained open.  <u>See, e.g.,</u> <u>Sandy</u>

<u>Point Dental, PC,</u> 488 F. Supp. 3d at 694 ("[W]hile coronavirus orders have

limited plaintiff's operations, no order issued in Illinois prohibits access to

plaintiff's premises.  Indeed, plaintiff concedes that dental offices were deemed

essential businesses for emergency and non-elective work.  Consequently,

plaintiff has failed to allege that access to its premises was prohibited by

government order, and its claim for civil authority coverage fails.") (citation

omitted).

### F.    Ingress-Egress Coverage

Olmsted fails to plead facts to invoke Ingress-Egress coverage, and, to the

extent the claim is based on the Executive Order, it is time barred.

The Policy provides coverage for:

[A]ctual loss sustained: . . . (b) during the period of time when as a
direct result of physical loss or damage to property of the type
insured from a peril insured against, ingress to or egress from the
Insured's **_Location_** is thereby physically prevented.

(Policy at 24.)

As analyzed with respect to Business Interruption coverage, Olmsted has

failed to plead a physical loss or physical damage to its property.  Second, it did

not plead that ingress to or egress from its property was "physically prevented."

Employees and patients could still enter and leave Olmsted's property during

the pendency of the first Executive Order to perform or undergo essential

medical procedures.  The Executive Order only limited the types of medical

procedures that could be performed on Olmsted's property, it did not affect

access to the property.  After the expiration of the Executive Order, employees

and patients continued to access the property for procedures, even if at a lower

frequency.

Accordingly, based upon the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED**:

Defendant Continental Casualty Company's Motion to Dismiss
[Docket No. 17] is **GRANTED** and this matter is dismissed with
prejudice.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:   January 13, 2022                    s/Michael J. Davis
                                             Michael J. Davis
                                             United States District Court